**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DANA and ANGELA DOTSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN HONDA MOTOR CO., INC. d/b/a | ) | |
| ACURA and ED NAPLETON ELMHURST | ) | |
| IMPORTS, INC. d/b/a ED NAPLETON ACURA, | ) | |
| | ) | CLASS ACTION |
| Defendants. | ) | JURY DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiffs, by and through their attorneys, file this class action complaint against

American Honda Motor Co., Inc. d/b/a Acura and Ed Napleton Elmhurst Imports, Inc. d/b/a Ed

Napleton Acura for, among other things, their deceptive and unfair marketing and sale of Acura

"Certified Pre-Owned" vehicles.

## PREFATORY ALLEGATIONS

1.      Other than purchasing a home, a car is the biggest expense that a consumer will

ever have.  That is why consumers want to ensure that whatever car they purchase, it will be

reliable and sold as represented.  Purchasing a used car has always been filled with uncertainty

because the consumer would not know the true condition of the vehicle until after purchase.  For

that reason, many consumers would steer clear of used cars altogether, and buy a new car instead.

2.      To ease consumers' fears about buying a used car, car companies such as

American Honda Motor Co., Inc., the manufacturer of Acura vehicles, concocted a "certified pre-

owned" program in which it represented to consumers that certain used vehicles were as good as

1

new.  On Acura's website for instance, it states "[w]hen you purchase an Acura certified used

vehicle, you can expect the same uncompromising standards of a brand new car."  *See, e.g.*,

Group Exhibit A.  According to Acura, in order to get "certified," the used car must pass rigorous

tests and meet Acura's stringent standards.

3.      Not only are the "certified" used cars significantly more marketable than

uncertified use cars because they are stamped with Acura's approval, but they sell for more than

their "uncertified" used car counterparts, thus creating a big incentive to sell certified used

vehicles instead of uncertified ones.

4.      However, despite its representations, Acura has little if anything to do with the

actual certification process and has no approval on which vehicles get to be sold as a "certified

pre-owned" Acura.  Instead, it has its dealers, without any meaningful oversight by Acura,

perform the actual inspections and certifications.  Acura does little but make more money as, on

information and belief, it receives an additional payment from its dealers for each certified pre-

owned vehicle sold.  As a result, the certified used car program is a mere ruse to prompt

consumers to buy used cars they would not otherwise purchase (or would only purchase for

significantly less money).

## PARTIES

5.      Plaintiff Dana Dotson is a consumer who resides in this district.

6.      Plaintiff Angela Dotson is a consumer who resides in this district.

7.      Defendant American Honda Motor Co., Inc. d/b/a Acura ("Acura") is a California

company with its principal place of business in California.  Acura is Honda's luxury brand and

the product of an operating division launched by Honda in 1986.  The Acura division maintains

2

its principal place of business at Honda's Torrance, California headquarters. Acura conducts a significant amount of business, including the marketing and sale of its vehicles, in the state of Illinois.

8.    Defendant Ed Napleton Elmhurst Imports, Inc. d/b/a Ed Napleton Acura ("Acura dealer") is an Illinois company with its principal place of business in Elmhurst, Illinois. The conduct of its employees alleged herein was within the course and scope of their employment with and for the benefit of itself and Acura. At all relevant times, the Acura dealer was the express and/or implied agent of Acura with regard to: a) the certification and inspection of the Acura MDX sport utility vehicle as an Acura Certified Pre-Owned Vehicle; and b) the misrepresentations and omissions of material fact relating to the Acura Certified Pre-Owned Program, as well as the inspections and certifications made pursuant thereto.

9.    The Acura dealer was the express and/or implied agent of Acura for all conduct complained of herein, and acted in concert within the course of such agency to the detriment of Plaintiffs and the class members. Specifically, Acura and the Acura dealer acted together to sell "certified pre-owned" cars, whereby Acura cloaked the Acura dealer with authority to inspect and certify cars pursuant to the Acura "Certified Pre-Owned" program, and expressly represented to consumers that all conduct committed by the Acura dealer was expressly and/or impliedly authorized by Acura by virtue of, among other things: 1) directing Plaintiffs to purchase a certified pre-owned vehicle at the Acura dealer on Acura's website; 2) branding the certification and inspection documents with Acura's logo; and 3) promising consumers that the all certified vehicles will be stringently inspected by "Acura dealership technicians."

**JURISDICTION AND VENUE**

10.     This Court has jurisdiction pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. 1332(d), because it is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and at least one member of the class of plaintiffs is a citizen of a state different than Acura.

11.     Venue is proper in this district pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

**FACTS**

***Acura's "Certified Pre-Owned" Program***

12.     Acura dealers sell used Acura cars that are labeled as "Acura Certified Pre-Owned Vehicles."

13.     In its advertisements, Acura represents to consumers that its certified pre-owned vehicles are just as good as new ones, by making statements such as: "[o]nce an Acura, always an Acura" and "[w]hen you purchase an Acura Certified Pre-Owned vehicle, you can expect the same uncompromising standards of a brand new Acura."  *See, e.g.*, Group Exhibit A.

14.     In order to put consumers at ease regarding purchasing a used car, Acura further represents that each certified vehicle must pass a comprehensive 150-point inspection where almost every part of the vehicle is inspected and serviced to ensure it lives up to Acura's standards.  *See, e.g.*, Group Exhibit A.

15.     The impression given by Acura's certified pre-owned program is that the consumer is buying a like-new, manufacturer-quality vehicle, which increases the value of the car.  As a result, a used car certified as Acura Certified Pre-Owned Vehicle sells at a higher price

than an identical used car that is not certified. Additionally, a vehicle certified by the manufacturer is by design, made to make the consumer feel secure in that the used vehicle is just as good as a new one.

16.     Acura promotes its certified pre-owned program to the public and deliberately fosters consumer expectation that the certified vehicle program is performed, sponsored, supervised, monitored, audited, and enforced by Acura.

17.     However, Acura's representations are false and misleading because Acura fails to adequately perform, supervise, monitor, and audit its certified pre-owned car program, and instead, uses used car dealers perform the inspections and certifications that determine which vehicles are certified as Acura Certified Pre-Owned Vehicles.

18.     In sum, the certified pre-owned car program by Acura is a sham. Consumers like Plaintiffs have paid thousands more for a car labeled "certified" because car manufacturers like Acura have led them to believe that the manufacturer has a direct role in providing a quality vehicle, and will stand behind that vehicle. In other words, Acura created the Acura certified pre-owned brand in order to induce consumer to purchase vehicles that are, at best, nothing more than used cars purportedly inspected and certified by the used car dealership selling them.

### *Facts Specific to Plaintiffs*

19.     In July 2007, Dana and Angela Dotson were looking to buy a new car. Though they had always purchased new cars, after viewing Acura's advertisements touting the quality and reliability of the cars qualifying for its "certified pre-owned" program, they considered buying an Acura "like-new" car instead.

20.     The Dotsons viewed multiple advertisements made by Acura regarding its

certified pre-owned car program, including the representations on its website, in which Acura represented, among other things, that its certified pre-owned vehicles satisfied the stringent standards of a brand-new Acura, and that only vehicles that passed Acura's comprehensive 150-point inspection could qualify as an Acura certified pre-owned vehicle. *See, e.g.,* Group Exhibit A (emphasis added).

21.     Acura further promised that Acura-trained dealership technicians would conduct a thorough inspection of 150 items on the vehicles, including the braking system as well as the battery. *See*, *e.g.*, Group Exhibit A.

22.     Believing Acura's representations to be true, Plaintiffs did a "vehicle search" on Acura's website to locate a certified pre-owned car that met their specifications. Acura's website directed Plaintiffs to its agent, the Acura dealer, which listed a Certified Pre-Owned 2004 Acura MDX sport utility, VIN 2HNYD18914H535849 (the "MDX") for sale.

23.     By listing the MDX as an "Acura Certified Pre-Owned Vehicle," Defendants represented, among other things, that:

   a. The MDX had passed Acura's comprehensive 150-point inspection;

   b. Virtually every part of the vehicle, including the braking system and the battery, was checked and was found to be "like new" in that 150-point inspection; and

   c. That the MDX satisfied the same uncompromising standards of a brand-new Acura.

24.     On August 3, 2007, Plaintiffs went to the Acura dealer to view the MDX. Upon arrival, they met with Phillip Pickett, an Acura dealer employee, who allowed Plaintiffs to take the car for a test drive. Pickett further represented that, as a certified pre-owned vehicle, the MDX was thoroughly inspected and that all problems are repaired according to Acura's

6

standards.

25.     On August 14, 2007, the Dotsons went back to the Acura dealer and purchased the MDX for $29,546.24.

26.     Immediately after leaving the dealership with their "like new" MDX, Plaintiffs noticed a squeaking noise coming from the rear of the vehicle.  Later that night, Plaintiffs noticed that the brakes were also not working properly.

27.     On August 14, 16, 24, and 29, 2007, the car would not start and needed to be jumped.  The battery died on these occasions despite Defendants' promise that the battery passed the 150-point inspection.

28.     On August 30, 2007, Dana Dotson called Phillip Pickett and informed him that the battery kept failing in the MDX.  Mr. Pickett did not return the phone call.

29.     On September 4, 2007, Dana Dotson called Corporate Acura Client Services to complain about the lack of follow up of the Acura dealer and was told that Acura would send a message to the Acura dealer to contact him.

30.     On September 4, 2007, Acura sent Plaintiffs a letter congratulating them on their purchase of the certified Acura that "was carefully selected, thoroughly inspected, and serviced by the dealer prior to delivery."  *See* Exhibit B.

31.     On September 10, 2007, Angela Dotson took the MDX to the Acura dealer for service and complained of numerous problems with the vehicle, including but not limited to, it squeaked, had a battery that kept dying, and brakes that had problems stopping.  The service department checked the battery and indicated that it needed to be replaced because it had a difficult time holding a charge.

7

32.     Perry Gallecki, the Acura dealer manager, indicated that even though the battery was required to be checked and warranted for all certified pre-owned vehicles, Defendants would not cover the cost of replacing the battery.

33.     It was then that Angela Dotson asked for a copy of the MDX's certification, which the Dotsons were never provided with at the time of purchase as required under the Acura certified pre-owned program.  The Acura dealer again failed to provide her with the certification as requested.

34.     On September 10, 2007, Dana Dotson called Acura Client Services to complain about the certification process of the MDX and indicated that he did not believe that the car was properly certified.

35.     Coming as a shock to Dana Dotson, the Acura representative, for the first time, informed Dana Dotson that the certification process is only performed and monitored by the dealer, and therefore, Acura would not get involved.

36.     Dana Dotson then spoke with Brian Harrison, Regional Case Manager for Acura Client Services, and complained about the certification process because the MDX as represented, *i.e.* a "certified" pre-owned vehicle, was not in fact certified.  Dotson further complained that the MDX was not a certified pre-owned vehicle because of the problems with the battery and brakes, as well as the other noises coming from the MDX.

37.     In response to Dotson's complaint, Brian Harrison educated Dana Dotson as to the true nature of the Acura certification program.  Mr. Harrison explained that the problems existed because Acura dealers, such as the one here, have an incentive to certify cars without repairing them in order to sell the vehicles at higher profit margins.

8

38.     On September 18, 2007, Brian Harrison called Dana Dotson and represented that he had received a copy of the MDX's 150-point inspection report.  *See* <u>Exhibit C</u>.  The inspection report appeared to be performed, *i.e.* post-dated, almost one month after the sale of the MDX.  As a result, the veracity of the report was in question.  Thus, Acura authorized Plaintiff to have the MDX re-inspected by a different Acura dealer, Joe Rizza Acura.

39.     On September 25, 2007, Angela Dotson took the MDX to Joe Rizza Acura, who, after inspecting the vehicle, stated that there were some serious safety issues with the MDX and that he needed to keep the vehicle at the dealership.

40.     On September 28, 2007, Ted Jurick of Joe Rizza Acura told Plaintiffs that the car was not maintained properly overall and had major safety concerns, including that it had a serious brake/rotor problem.

41.     In fact, the brakes were so bad that a representative of Joe Rizza Acura stated that the brakes were so bad that "I don't know how your MDX was able to stop."

42.     A representative of Joe Rizza also informed Plaintiffs that the MDX was in a condition that should have prohibited the MDX from ever being certified.

43.     While Joe Rizza and the other Acura dealer seriously differed in the results of their findings, Plaintiffs were instructed by Acura, through Joe Rizza, to take the MDX back to the original Acura dealer for all repairs.

44.     Dana Dotson then contacted Brian Harrison at Acura Corporate regarding Acura's requirement that repairs be performed at the original Acura dealer.

45.     Brian Harrison stated that though Acura would fix the serious safety issues with the MDX, it would not cover the cost of all items that were required to be replaced and repaired

in order to get the MDX into a certifiable condition, items that were required to be in certifiable condition pursuant to the 150-point inspection.

46.     Brian Harrison also stated that Acura would not cover the cost of repairing the dents and scratches to the rear and front bumper of the MDX – dents and scratches that would have made the car uncertifiable had the car ever been properly inspected prior to certification.

47.     When Dana Dotson complained that Acura would not bring the MDX up to the condition that it should have been in to qualify as a certified pre-owned vehicle (or to allow Plaintiffs to return the car and undo the transaction), Brian Harrison stated that the only course of action available to Plaintiffs was legal action.

48.     In sum, the MDX was advertised by Acura and its Acura dealer as a "certified" vehicle.  As a certified pre-owned vehicle, the car was advertised to meet Acura's "uncompromising standards, " to have undergone a "comprehensive 150-point vehicle inspection" by "Acura Dealership technicians" where "[v]irtually every mechanical system – from the engine to the door locks – is checked and serviced to meet precise specifications, and a thorough appearance inspection [that] scrutinizes fit and finish – inside and out – to ensure that every vehicle upholds the luxury and sophistication of the Acura name."  However, it is clear that even though the MDX was stamped as certified, it was not properly inspected prior to the Dotsons' purchase thereof and could never have qualified as a certified pre-owned vehicle.

## COUNT I – ILLINOIS CONSUMER FRAUD ACT
### *Brought By Plaintiffs, Individually And On Behalf Of Class A, Against All Defendants*

49.     Plaintiffs hereby restate paragraphs 1-48 as if set forth fully in this Count.

50.     This claim is brought by the Plaintiffs individually and on behalf of Class A which consists of all persons who purchased an Acura Certified Pre-Owned Vehicle.

51.    The Class is so numerous that joinder of all members is impracticable.

52.    There are questions of law and fact common to the members of <u>Class A</u>, which questions predominate over any questions affecting only individual class members.  These questions include, but are not limited to, the following:

     a.  Whether Acura and its Acura dealers engaged in a pattern or practice of selling Acura Certified Pre-Owned Vehicles that were not in fact certified or inspected;

     b.  Whether Acura engaged in a pattern or practice of representing to consumers that its dealers/agents were thoroughly inspecting and examining the vehicles even though it had no oversight over the certification process, and in fact, took little or no part in such process;

     c.  Whether Acura and its Acura dealer's representations of the certified pre-owned process is deceptive and unfair.

53.    Plaintiffs' claims are typical of the claims of the putative Class members.

54.    Plaintiffs will fairly and adequately represent the members of the Class.  Plaintiffs have retained counsel experienced in the prosecution of class actions and consumer fraud claims.

55.    A class action is the superior device for the fair and efficient adjudication of this matter in that Acura has inflicted similar damages to a large number of persons through a single course of conduct and individual actions are not economical.  This Court and the parties would enjoy economies in litigating common issues on a class-wide basis instead of a repetitive individual basis.

56.    No unusual difficulties will likely occur in the management of the Class as all questions of law or fact to be litigated at the liability stage are common to the putative Class and all compensatory relief is concomitant with a liability finding and can be calculated by automated and objective means.

57.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL.

Comp. Stat. § 505/2 ("ICFA"), states, in relevant part:

> *unlawful or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful.*

58. The ICFA prohibits both unfair and deceptive acts and practices.

**<u>Deceptive Acts and Practices</u>**

59. In order to induce Plaintiffs and other similarly situated consumers to purchase Acura's certified pre-owned vehicles, Acura and its dealers represented to consumers that in order for a car to qualify as a certified pre-owned Acura, it must pass a 150-point inspection that will ensure that the vehicle will satisfy the same uncompromising standards of a brand-new Acura.

60. These representations are both unfair and deceptive in that Acura does little if anything to ensure that the certification process outlined in its advertisements is actually adhered to, and, if discovered that it has not been adhered to, Acura fails to unwind the transaction and put the consumer back in pre-contract position prior to being fraudulently induced.

61. Acura and its dealer misrepresented that the MDX: 1) had been inspected under Acura's certified pre-owned program; 2) qualified as an Acura certified pre-owned vehicle; and 3) had passed the comprehensive 150-point inspection.

62. Acura's misrepresentations were false in that the MDX had not been inspected prior to certification, and could not satisfy Acura's stringent inspection as the battery and braking systems were faulty. Moreover, the MDX could never have qualified as a certified pre-owned car due to, among other things, the significant scratches and dents to the MDX's exterior and an

after-market radio.

63.     These misrepresentations would have affected and are material to a reasonable consumer's purchase decision.  In fact, such representations were material to Plaintiffs as they would never have purchased the MDX had they known that the above representations were false.

64.     And Acura made such representations regarding the inspection and condition of its certified vehicles, including the MDX, to Plaintiffs and the members of the class even though it failed to supervise, audit, and monitor the Acura Certified Pre-Owned Program in order to insure its dealer-agents' compliance with Acura's own promises, rules, and procedures.

65.     In fact, all vehicles represented for sale as Acura Certified Pre-Owned Vehicles are not inspected or monitored by Acura, but by its dealers that sell the vehicles, without any Acura oversight.

66.     Acura's representations were deceptive and misleading because its dealer/agents, and not Acura, were solely responsible for inspecting and certifying the vehicles and Acura took no steps to insure that the cars being certified by the dealers were actually certifiable.  Thus, despite promising that the standards and procedures of its certified pre-owned program would be met, it permitted uncertifiable Acura vehicles to be sold at a premium under the certified pre-owned moniker.  In sum, Acura created a marketing campaign targeted to Plaintiffs and the members of Class A, whereby it deceptively advertised cars as "Acura certified pre-owned" as opposed to what they were, "car dealer certified" vehicles.

67.     Acura and its Acura dealers intended that Plaintiffs and the members of the class rely on its deceptive representations in order to induce it to purchase Acura certified pre-owned vehicles.

## **Unfair Acts and Practices**

68.     Without taking any action to ensure compliance with the procedures and accuracy of its Certified Pre-Owned Acura program, Acura and its Acura dealer unfairly inflated the price of its vehicles by permitting them to be sold as certified pre-owned regardless of whether or not such vehicles were actually "certifiable."

69.     Acura and its Acura dealer's conduct violates the public policy of this state, which prohibits manufacturers from misrepresenting the quality and nature of their products in the marketplace.

70.     Defendants' conduct was unscrupulous, unethical, immoral, and unfair as it induced consumers like Plaintiffs to purchase a used car at an inflated price by labeling and promoting vehicles as "certified pre-owned," even though it took little or no action to ensure that only vehicles that passed the inspection process were sold as such.

71.     Plaintiffs and the class members suffered substantial injury in that they purchased a product worth far less than represented as the cars were not certified by Acura, but by a used car dealership.

72.     The conduct complained of in this Count was part of a pattern and practice of recklessly allowing its dealers/agents to misrepresent that vehicles conform to the requirements of the Acura certified pre-owned program under circumstances where, on information and belief, it profits from every such transaction by taking a fee from a dealer for every such certification in reckless disregard for the rights and safety of its secondary market customers who drive the dangerous vehicles it falsely warrants as meeting the requirements of its certified pre-owned inspection.

73.     As a direct and proximate result of Defendants' violations, Dan and Angela Dotson and the members of <u>Class A</u> suffered actual and substantial damages in that, among other things, they paid a premium to purchase a certified pre-owned vehicle that was worth far less.

WHEREFORE, Plaintiffs Dana and Angela Dotson respectfully request that this Court enter judgment in their favor and in favor of <u>Class A</u> against American Honda Motor Co., Inc. d/b/a Acura and Ed Napleton Elmhurst Imports, Inc. d/b/a Ed Napleton Acura for the following relief:

   a.   Actual damages;

   b.   Punitive damages in an amount sufficient to punish and deter Defendants and others from conducting themselves in the manner complained of in this Count;

   c.   Attorneys' fees, litigation expenses, and costs pursuant to 815 ILL. COMP. STAT. § 505/10a(c); and

   d.   Such other or further relief as this Court deems just and appropriate.

## <u>COUNT II – ILLINOIS CONSUMER FRAUD ACT</u>
### *Brought By Plaintiffs, Individually, Against All Defendants*

74.     Plaintiffs hereby restate paragraphs 1-48 as if set forth fully in this Count.

75.     The ICFA, 815 ILL. COMP. STAT. § 505/2, states, in relevant part:

> *unlawful or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful.*

76.     In or about August 2007, Acura and its Acura dealer misrepresented the following material facts to Plaintiffs:

   a.   The MDX listed for sale and sold to Plaintiffs was an Acura Certified Pre-Owned Car;

   b.   All major vehicle systems were scrutinized by Acura-trained technicians; and

15

     c.   The MDX had passed Acura's 150-point mechanical and appearance inspection.

77.     These representations were material to Plaintiffs' purchase decision as they would not have purchased the MDX had they known it was not a certified pre-owned Acura.

78.     These representations were false as the MDX was neither inspected nor certified prior to Plaintiffs' purchase. As such, the MDX was improperly sold as a certified pre-owned Acura.

79.     The Acura and its Acura dealer intended that Plaintiffs rely on these false statement of material facts in order to induce Plaintiffs to purchase the MDX.

80.     As a direct and proximate result of Acura and its Acura dealer's conduct, Plaintiffs were damaged by purchasing a defective MDX that was worth far less than the purchase price.

WHEREFORE, Plaintiffs Dana and Angela Dotson respectfully requests that this Court enter judgment in their favor and against American Honda Motor Co., Inc. d/b/a Acura and Ed Napleton Elmhurst Imports, Inc. d/b/a Ed Napleton Acura for the following relief:

     a.   Actual damages;

     b.   Punitive damages in an amount sufficient to punish and deter Defendants and others from conducting themselves in the manner complained of in this Count;

     c.   Attorneys' fees, litigation expenses, and costs pursuant to 815 ILL. COMP. STAT. § 505/10a(c); and

     d.   Such other or further relief as this Court deems just and appropriate.

### Count III – COMMON LAW FRAUD
***Brought By Plaintiffs, Individually, Against All Defendants***

81.     Plaintiffs hereby restate paragraphs 1-48 as if set forth fully in this Count.

82.     In August 2007, Acura represented that all Acura certified pre-owned vehicles satisfied were like-new and passed a 150-point inspection. Acura further represented on its website that the MDX was a "certified" pre-owned Acura that could be purchased at the Acura dealer.

83.     The Acura dealer, and its employees, including Phillip Pickett, represented to Plaintiffs that the MDX was a certified pre-owned Acura vehicle that had passed all of Acura's requirements in order to be labeled as such.

84.     Defendants knew that their representations were false at the time such statements were made to Plaintiffs and were made with the intent that Plaintiffs act in reliance thereon.

85.     Believing Defendants' statements to be true, Plaintiffs acted in reliance thereon and purchased the MDX, to their detriment.

86.     Plaintiffs suffered damage as a result of Defendants' fraudulent statements, including but not limited to, paying a purchase price for the MDX that was in far excess of the amount the car was actually worth, as well as aggravation and stress.

WHEREFORE, Plaintiffs Dana and Angela Dotson respectfully request that this Court enter judgment in their favor and against American Honda Motor Co., Inc. d/b/a Acura and Ed Napleton Elmhurst Imports, Inc. d/b/a Ed Napleton Acura for the following relief:

    a.   Actual damages;

    b.   Punitive damages; and

    d.   Such other or further relief as this Court deems just and appropriate.

## COUNT IV – MAGNUSON-MOSS
### *Brought By Plaintiffs, Individually And On Behalf Of <u>Class A</u>, Against All Defendants*

87.     Plaintiffs hereby restate paragraphs 1-48 as if set forth fully in this Count.

17

88.    Plaintiffs and the members of Class A are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

89.    Acura is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

90.    The Acura dealer, as Acura's agent, is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

91.    The vehicles at issue in this lawsuit are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

92.    Defendants' written affirmation of fact, promises, and/or descriptions as alleged herein in both their advertisements, representations of the vehicles as "certified pre-owned, as well as Acura's limited warranty, are each a "written warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  Defendants' breached these written warranties as the vehicles were different than and failed to perform as warranted because they were not properly inspected and certified.

93.    As the vehicles were not inspected and certified as warranted, Defendants breached their written warranties and have refused to repair or replace such vehicles to permit them to pass the 150-point inspection as warranted.  Defendants therefore failed to honor the warranties for the vehicles.

94.    Plaintiffs and the members of Class A were damaged in that, among other things, they paid for "certified pre-owned" vehicles that were different than advertised, *i.e.* the vehicles were worth significantly less than warranted due to Defendants' failure to adequately inspect and certify the vehicles as warranted.

95.     Plaintiffs notified Defendants of their breach, and Defendants, through the principal Acura, refused to cure all defects with the vehicle.  In fact, Brian Harrison of Acura informed Plaintiffs that they would have to pursue legal action to obtain further remedy.

WHEREFORE, Plaintiffs Dana and Angela Dotson respectfully request that this Court enter judgment in their favor and in favor of Class A and against American Honda Motor Co., Inc. d/b/a Acura and Ed Napleton Elmhurst Imports, Inc. d/b/a Ed Napleton Acura for the following relief:

     a.   Actual damages;

     b.   Payment of all attorneys fees, litigation fees, costs, and other fees incurred; and

     c.   Such other or further relief as this Court deems just and appropriate.

## COUNT V – UNJUST ENRICHMENT
***Brought By Plaintiffs, Individually And On Behalf Of Class A, Against All Defendants***

96.     Plaintiffs hereby restate paragraphs 1-48 as if set forth fully in this Count.

97.     Plaintiffs and the members of Class A have fully performed all conditions, covenants, and promises required to be performed or were excused from any conditions, covenants, and promises.

98.     A party is unjustly enriched when it retains a benefit to the detriment of another party against fundamental principles of justice, equity, and good conscience.

99.     Defendants represented to Plaintiffs and the members of Class A that Acura certified pre-owned vehicles were just like new, and had been thoroughly inspected to ensure that it met Acura's uncompromising standards, in order to induce the purchase of such vehicles and to increase their profits from the sale of such vehicles.

100.     Defendants charged Plaintiffs and the members of Class A a greater amount for

the certified pre-owned vehicles than they charged consumers for used vehicles that were not "certified."

101.    Defendants representations were false and misleading in that the certified pre-owned vehicles were, among other things, not properly inspected,

102.    Defendants have reaped thousands of dollars in profits as a result of their false representations regarding the quality and nature of "certified pre-owned vehicles" as such vehicles sold at a price higher than their used car counterparts, and, on information and belief, Defendant Acura received additional compensation from its Acura dealer-agent for selling such vehicles as "certified."

103.    Defendants have been unjustly enriched by their above-described conduct.

104.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and the members of Class A suffered injury and therefore seek an order disgorging the monies that they have unjustly obtained to the detriment of Plaintiffs and the members of Class A.

WHEREFORE, Plaintiffs Dana and Angela Dotson respectfully request that this Court enter judgment in their favor and in favor of Class A and against American Honda Motor Co., Inc. d/b/a Acura and Ed Napleton Elmhurst Imports, Inc. d/b/a Ed Napleton Acura for the following relief:

    a.    Actual damages;

    b.    Punitive damages; and

    d.    Such other or further relief as this Court deems just and appropriate.

20

**Plaintiffs hereby demand a trial by jury.**

Respectfully Submitted,


DANA AND ANGELA DOTSON

By: /s/ Allison Krumhorn
One of Plaintiffs' attorneys

Lance A. Raphael
Stacy M. Bardo
Allison A. Krumhorn
Ravinder S. Sahota
THE CONSUMER ADVOCACY CENTER, PC
180 West Washington Street, Suite 700
Chicago, Illinois 60602
(312) 782-5808

Pete Lubin
DiTommaso Lubin
17W 220 22nd Street, Suite 200
Oakbrook Terrace, Illinois 60181
(630) 333-0000